UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

TEAMSTERS LOCAL UNION NO. 89                                          PLAINTIFF

v.                                                                    3:10-CV-00647-CRS

THE KROGER CO.                                                        DEFENDANT

## MEMORANDUM OPINION

This matter is before the court on two motions for summary judgment. The Plaintiff, Teamsters Local Union No. 89 ("the Union"), filed a motion for summary judgment against the Defendant, The Kroger Co. ("Kroger"), in which the Union seeks to compel Kroger to arbitrate its former employee's grievance pursuant to Kroger's collective bargaining agreement ("CBA") with the Union (DN 60). Kroger's motion for summary judgment contends that the CBA is inapplicable to the grievance at issue, and as such Kroger is not obligated to arbitrate (DN 57).

The Union's complaint asserts that by refusing to arbitrate, Kroger: (1) violated and breached Kroger's CBA with the Union; (2) violated the Labor Management Relations Act of 1947, 29 U.S.C. § 185 because Kroger is allegedly a joint employer of the grievant; and (3) violated the Federal Arbitration Act, 9 U.S.C. § 4 (DN 1). The Union seeks an order that Kroger is obligated to arbitrate, either in bilateral or tripartite arbitration, and that attorneys' fees are warranted (DN 1).

For the reasons set forth herein, the court will grant Kroger's motion for summary judgment as a matter of law and deny the Union's motion for summary judgment.

## BACKGROUND

The following facts are undisputed (DNs 57 and 60): Kroger owns a warehouse and distribution center, the Kroger Distribution Center ("KDC"). Prior to 2007, Kroger also employed warehouse and transportation employees at the KDC. Regarding these employees, Kroger and the Union were parties to two agreements, (1) a national CBA—the Kroger Master Agreement ("KMA")—which included a grievance and arbitration clause; and (2) a supplemental CBA, which addressed local union issues.

(1)     In October 2006, Kroger announced its intention to "changeover" operations at the KDC and contract with outside vendors for transportation and warehouse services.

(2)     In November 2006, Kroger and the Union bargained over Kroger's decision to use outside vendors at the KDC. The parties' negotiated a "Letter of Understanding" ("LOU") to ensure that KDC employees would retain bargaining unit protections while the Union negotiated agreements with the vendors.[1] In the LOU the parties agreed that until the Union reached a CBA with each vendor, Kroger would process pending employee grievances under the KMA.

(3)      In February 2007, the Union successfully negotiated CBAs with the vendors—Transervice Logistics Inc. ("Transervice") for transportation operations, and Zenith Logistics ("Zenith") for warehouse operations.

---

[1] Under the LOU, vendors were required to provide Kroger's former KDC employees: comparable retiree health coverage, subcontracting protection, pension contribution, and benefits for employees on long term disability leave (DN 60).

(4)     In April 2007, after the vendors negotiated CBAs with the Union, Kroger and the

Union amended the LOU and agreed (1) that Kroger would settle a specific list of

pending employee grievances under the KMA; (2) that the Union would withdraw

a specific list of pending grievances from being arbitrated under the KMA; (3)

that the LOU would expire in September 2011; and (4) that "Kroger will meet

with [the Union] and either resolve any outstanding grievances resulting from

[KDC employees'] employment with Kroger or permit the grievances to proceed

through the Kroger Master Grievance Process." (DN 57). The LOU was silent

regarding future employee grievances against Kroger. However, Kroger

specifically rejected two Union proposals: (a) Kroger would not allow all former

Kroger employees at the KDC to remain covered by Kroger's KMA; and (b)

Kroger would not agree to be a joint employer to all former Kroger employees at

the KDC (DNs 57 and 60).[2]

(5)     In February 2007, Kroger instituted the changeover and transferred KDC

operations to Transervice and Zenith. Pursuant to Kroger's negotiations with the

Union, the vendors hired most of Kroger's former employees at the KDC.

(6)     In April 2007—after the Union's ongoing CBA negotiations with the vendors

failed and the KDC employees went on a short strike—the Union finalized CBAs

---

[2] Although Kroger rejected these proposals in 2007, the Union revives the proposals in its motion for summary judgment here (DN 60). It seems that the Union is reviving the rejected proposals in an effort to include them in the parties' bargained-for agreement after the fact. Even if the court were to grant the Union's request for arbitration, it may be futile because in labor arbitration, a party cannot seek through arbitration what it failed to achieve through bargaining. Owen Fairweather, *Practice & Procedure in Arbitration* (4th ed.). "A proposal defeated during arbitration negotiations may not be 'bargained in' by way of arbitration." *Id.* at p. 252.

with Transervice and Zenith. After those CBAs were finalized, Kroger's former employees were covered by the Union's CBAs with Transervice or Zenith.

This case arose regarding a former Kroger employee, Frank Herdt, who worked as a driver at the KDC prior to the 2007 changeover (DNs 57 and 60). Transervice hired Herdt in 2007 and he became a bargaining unit employee under Transervice's CBA with the Union, which included an arbitration provision just as the KMA did with Kroger (DN 57).

In late 2009, Herdt was arrested for stealing from Kroger (DN 60). In response, Kroger's risk management department alerted Transervice, Herdt's employer, that Herdt was banned from Kroger property. He was no longer permitted to make deliveries to any Kroger facilities and denied further access to Kroger property, including the KDC (DNs 57 and 60).

In July 2010, the Union filed a grievance with Kroger on Herdt's behalf (DN 60). The grievance acknowledges that Herdt was not a Kroger employee, but rather a Transervice employee (DN 1). However, the Union identifies Kroger's KMA as the basis for the grievance and alleges that Kroger violated KMA Article 10, which provides that Kroger will not terminate an employee without just cause (DN 1).[3] The grievance states that "Kroger disciplined and caused the suspension of the grievant, Frankie Herdt, without just cause and without first being given a hearing, when it barred him from its property, continues to bar him from its property, and thereby prevents him from performing bargaining unit work." (DN 60). In other words, the

---

[3] KMA Article 10: Discharge or Suspension, states in pertinent part (DN 1): 10.1- The Employer [Kroger] shall not suspend or discharge any employee without just cause, but . . . shall give the necessary warning notice of the complaints against such employee. 10.2 - Violations on the part of an employee of the rules and regulations of the Employer, or violations of . . . state, or federal law . . . shall be considered cause for disciplinary action. However, no warning notice is necessary prior to discharge or suspension for dishonesty.. . . [Section 10.2] shall not preclude the Employer from suspending an employee, pending investigation, without a hearing under serious circumstances.

- 4 -

Union alleges that Kroger effectively terminated Herdt by banning him from Kroger property, even though Herdt was not directly employed by Kroger.

Herdt's criminal charges were later dismissed. Pursuant to Transervice's CBA with the Union, Transervice reinstated Herdt and he was awarded backpay and benefits (DN 60).

When Kroger banned Herdt from its property both Transervice and the Union contacted Kroger on Herdt's behalf (1) Transervice requested via letter that Kroger rescind the ban and allow Herdt onto its property, which Kroger denied (DN 57); and (2) the Union filed a grievance with Kroger, which Kroger refused to arbitrate (DN 60).

In response to Transervice, Kroger denied the request to allow Herdt onto Kroger's property in August and in September of 2010 (DN 57). Kroger noted that Herdt was Transervice's employee and the "decision as to what employment action to take with respect to Herdt belongs solely to Transervice." Thus, Kroger denied responsibility for paying Herdt's backpay and benefits, explaining that "[t]o suggest Kroger was responsible for any costs associated with the fact that ***your employee*** was stealing from Kroger, ***your customer***, is entirely inappropriate." (DN 57) (emphasis in original).

In response to the Union's grievance, Kroger's Vice President of Labor Relations stated via letter in September 2010 that (DN 60):

> Herdt was employed by Transervice and not Kroger. Further . . . Kroger and Local 89 [the Union] no longer have a collective bargaining relationship and Local 89 does not represent any Kroger employees. In addition, Kroger did not discipline or suspend Herdt. Rather, any actions taken with regard to [Herdt's] employment were taken by his employer, Transervice. Therefore, to the extent that the grievance alleges violations of the Kroger Master Agreement, be advised that Kroger will not agree to arbitrate this grievance. [Kroger] suggest[s] that you contact Transervice regarding any grievance.

- 5 -

Thus, Kroger contends (1) that it has not employed Herdt since 2007 and did not terminate him; (2) that Kroger is not party to a Union CBA that covers Herdt; (3) that Transervice both employs Herdt and has a Union CBA that covers his grievance; (4) that Herdt successfully exercised his right to grieve his dismissal with Transervice; (5) that Kroger is not obligated under any agreement to allow former employees perpetual access to Kroger-owned property, and (6) that Kroger's act of banning Herdt from its property was not termination (DN 60). Thus, Kroger refuses to participate in arbitration with the Union and asserts that the KMA is not applicable to Herdt's grievance.

## RELATED PROCEDURAL HISTORY

In August 2011, one year after the Union grieved Herdt's termination with Kroger, the Union filed an unfair labor practices charge against Kroger with the National Labor Relations Board ("NLRB"). The Union alleged that in 2011—four years after the changeover at the KDC—Kroger failed and refused to bargain in good faith with the Union regarding KDC employees (DN 57).[4] The NLRB dismissed the charge based on insufficient evidence (DN 57). The Union then appealed to the NLRB's Office of Appeals, which denied the appeal (DN 57).

The NLRB's Office of Appeals explained that it denied the Union's appeal (1) because the evidence "fails to establish that Kroger is a joint employer of the employees of Zenith and Transervice;" (2) because the Union's evidence of joint employer status "is consistent with Kroger being the customer of Zenith and Transervice;" and (3) because Kroger "no longer

---

[4] The Union alleged that Kroger failed and refused: (1) to collectively bargain in good faith; (2) to negotiate a successor agreement to cover the Union members at the KDC; (3) to negotiate the terms and conditions of employment of Union members at the KDC; (4) to negotiate the effects of Kroger's decision on the employment of Union members at the KDC; (5) to acknowledge the collective bargaining agreements and other agreements regarding the terms and conditions of employment, job security, and other protections for Union members at the KDC, and that Kroger also sought to repudiate or modify the employment conditions mid-term without the Union's consent (DN 57).

directly employs Local 89 members." (DN 57). The NLRB reasoned that a "business entity that is the customer of an employer and owns the property utilized by the employer to operate its business has some impact on the day-to-day activities of the employees of the employer, but this impact does not establish a joint employer status." *(citing AM Prop. Holding Corp.*, 350 NLRB 998 (2007) *enforce*d, 647 F.3d 435 (2d Cir. 2011)); *Teamsters Local Union No. 89 v. Kroger Co.*, 617 F.3d 899, 910 (6th Cir. 2010).

## DISCUSSION

Both Kroger and the Union request summary judgment under Fed. R. Civ. P. 56(a), which states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party moving for summary judgment bears the initial burden of specifying a basis for its motion by demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Not every factual dispute between the parties will prevent summary judgment, the disputed facts must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). After the moving party meets this burden, the nonmoving party bears the burden of showing "specific facts showing that there is a genuine issue for trial." *Id.* at 248 (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

However, the evidence must be construed in the light most favorable to the party opposing the motion. *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold Inc.*, 369 U.S. 654, 655 (1962)). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson,* 477 U.S. at 255. Plaintiffs must offer evidence demonstrating a genuine issue of material fact. *Celotex,* 477 U.S. at 322.

# I

## Whether Kroger is Obligated to Arbitrate Under the KMA

A party is not obligated to arbitrate a labor dispute unless it has contractually agreed to do so. *Litton Financial Printing v. N.L.R.B.*, 501 U.S. 190, 200 (1991); *United Steelworkers v. Warrior Gulf Navigation Co.*, 363 U.S. 574 (1960). "[W]hether or not [a] company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract between the parties." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964)*; see also Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105-06 (Ky. 2003).

When the issue is whether a collective bargaining agreement creates a duty for the parties to arbitrate, any dispute between the parties subject to a collective bargaining agreement is presumed arbitrable. *Warrior Gulf*, 363 U.S. 574; *AT&T Tech., Inc. v. Commc'n Workers of Am.*, 475 U.S. 642, 650 (1986). The arbitrability of the grievance is an issue for judicial determination and the presumption of arbitrability may be overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 582-83. The court does not weigh the merits of a grievance or determine the rights of the parties under a collective bargaining agreement. *AT&T*, 475 U.S. 642. Our "role is limited to deciding if 'the party seeking arbitration is making a claim which on its face is governed by the contract.'" *Gen. Drivers, Salesmen & Warehousemen's Local Union No. 984 v. Malone & Hyde, Inc.*, 23 F.3d 1039, 1043 (6th Cir. 1994) (*quoting United Steelworkers of Am. v. American Mfg. Co.*, 363 U.S. 564, 568 (1960)).

Regarding arbitrability, "the court generally faces two separate scenarios. In one . . . the court must determine whether the collective bargaining agreement covers the dispute at issue. This is a matter for the court to decide." *Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers, Local Union No. 44 v. J&N Steel & Erection Co.*, 8 F. App'x 381, 385-86 (6th Cir. 2001). The second scenario concerns whether there is a valid agreement to arbitrate, such as when a party argues "that the arbitration agreement has expired or terminated." *Id.* Where the dispute turns on whether an agreement to arbitrate has expired or terminated, "the question of termination is for the arbitrator." *Id.* at 386.

Here, the contractual matter at issue concerns Kroger's refusal to arbitrate Herdt's termination grievance under the KMA.[5] The Union argues that the Sixth Circuit's holding in *Teamsters Local Union No. 89 v. Kroger Co.*, 617 F.3d 899 (6th Cir. 2010) ("*Teamsters I*") supports its contention that the KMA was both applicable and still in effect in July 2010 when the Union grieved Frank Herdt's termination with Kroger (DN 57).

Like the case at issue here, *Teamsters I* involved the application of the KMA to an employee grievance that occurred after the 2007 changeover. In *Teamsters I*, the Union filed grievances against Kroger seeking to compel arbitration. The Union alleged that Kroger violated the KMA by subcontracting transportation operations to non-Union third party drivers at the KDC when bargaining unit drivers were available. *Id.* Kroger counter-argued that the KMA was

---

[5] As a threshold matter, the court need not address the Union's contention that it is improper for this court to determine whether or not Kroger was obligated to arbitrate Herdt's grievance under the KMA (DN 60). The Union asserts that determining whether a CBA terminated or expired is one for an arbitrator (DN 60). However, as the plaintiff in this case the Union availed itself of the jurisdiction of this court and the issue at hand is not merely whether or not the KMA expired, but whether the KMA is applicable to Herdt's grievance. The undisputed facts indicate that Kroger did not agree via the KMA or the LOU to arbitrate disputes that arise between a former Kroger employee and his or her current employer (DN 57). Thus, it is appropriate for the court to determine whether Kroger is obligated to arbitrate Herdt's termination grievance under the KMA. *See J&N Steel & Erection Co.*, 8 F. App'x 381, 385-86.

no longer applicable to the alleged violations because the subcontracting work took place after the changeover and that post-changeover grievances were not subject to the arbitration provisions of either the KMA or Kroger's local agreement. *Id.* Kroger also argued that it no longer had a collective bargaining relationship or grievance procedure with the Union regarding its former employees at the KDC. *Id.*

The Federal District Court for the Western District of Kentucky granted summary judgment in favor of the Union, which the Sixth Circuit affirmed—holding that Kroger had an obligation to arbitrate former KDC employees' grievances with regard to subcontracting. *Id.* The Sixth Circuit reasoned that the KMA specifically addressed the possibility of Kroger subcontracting its KDC operations, and neither the KMA, the local agreement, or the LOU limited the applicability of the arbitration provision regarding subcontracting. *Id.* at 906-10. Based on specific language in the job-security provision, the court held that the KMA "provide[s] protections to ***former*** Kroger employees who lost their positions at Kroger because Kroger subcontracted out its KDC operations." *Id.* at 908 (emphasis in original). The court also reasoned that based on the facts before it, if it were to hold that the former employees were "ineligible to grieve complaints about Kroger subcontracting" because they were no longer Kroger employees there would be no one eligible to file grievances. *Id.*

The issues in *Teamsters I* were whether a valid agreement to arbitrate existed between the parties, and whether the subcontracting dispute fell within the scope of the agreement. *Id.* at 904. The Sixth Circuit held that Kroger was obligated to arbitrate grievances related specifically to subcontracting commitments, based on the factual situation before it, because the arbitration provision in the KMA was broad, there is a presumption in favor of arbitrability, and none of the

parties' agreements demonstrated an intent to exclude subcontracting grievances from arbitration under the KMA. *Id.* at 907-08. However, the Sixth Circuit did not define the scope of arbitable rights that all former Kroger employees may or may not have under the KMA, nor did it hold that Kroger was obligated to arbitrate all former KDC employees' grievances under the KMA. *See Id.*

Here, the Union contends that Kroger is obligated to arbitrate Herdt's termination grievance under the KMA because the Sixth Circuit's holding in *Teamsters I* applies to and controls in this case (DN 60). The Union argues that pursuant to *Teamsters I*, Kroger must arbitrate all former KDC employees' grievances under the KMA, whether or not the grievance is related to subcontracting, because the KMA's arbitration provision is broad, and because a broad provision mandates a presumption of arbitrability and provides protections for former employees under the KMA (DN 60).

Kroger, both in response and in its motion for summary judgment, contends that *Teamsters I* is inapplicable here. Kroger argues generally that *Teamsters I* was decided on a different set of facts and is thus distinguishable from this case because *Teamsters I* involved subcontracting-related grievances, and this case involves the exclusion of a former Kroger employee from Kroger-owned property.

Upon review we conclude that, while *Teamsters I* is valid law, it is inapplicable under the circumstances of this case. Unlike the court in *Teamsters I*, we must consider whether Kroger is obligated to arbitrate a former KDC employee's termination grievance under the KMA when the employee's current employer is also a party to a CBA containing an arbitration provision for wrongful termination.

In this case, Herdt was not without any avenue to remedy his grievance. Herdt was not an employee of Kroger at anytime applicable to this dispute. He was Transervice's employee and Transervice terminated him—Kroger merely banned him from Kroger-owned property.[6] Here, Herdt is an employee with an available remedy under a CBA. Herdt's remedy under the Union's CBA with Transervice would include possible reinstatement, with backpay and benefits from Transervice, not Kroger. In fact, it is undisputed that Herdt has received reinstatement with backpay and benefits from Transervice. Thus, Herdt is not bereft of any remedy as were the grievants in *Teamsters I*.

The cases are facially similar because both address former employees' grievances which seemingly could be grieved under the KMA. However, one chief difference is that in *Teamsters I*, the grievants' only recourse was to grieve under the KMA, whereas here Herdt is protected by his current employer's CBA (DN 57). Herdt is not covered by the Union's CBA with Kroger because Kroger had no CBA for KDC employees when Herdt's dispute arose. Herdt had been employed for over three years by Transervice when he was terminated. If we were to obligate Kroger to arbitrate Herdt's grievance again under Kroger's KMA we would be ignoring the fact that Herdt has already successfully exercised his right to grieve.

*Teamsters I* is also distinguishable because the issue for decision in *Teamsters I* was whether or not the grievants' subcontracting dispute was arbitrable under the KMA—not whether the KMA as a whole applies to former KDC employees, as is claimed here. *Id*. at 904. The two cases are completely different considering the fact that *Teamsters I* addressed Kroger's

---

[6] Although the Union contends that Kroger effectively terminated Herdt because Kroger's ban allegedly prevented Transervice from reinstating him, Kroger responds and the court agrees, that Kroger is not preventing Herdt's reinstatement. As Herdt's employer, Transervice controls his hiring and firing, and whether or not Transervice chooses to employ Herdt at another, non-Kroger location, is Transervice's choice (DN 66).

subcontracting in violation of the KMA whereas here we address Kroger's banning Herdt from its property, which is not a violation of the KMA.

*Teamsters I* identified a narrow protection only for former Kroger employees with subcontracting-related grievances. *Id.* at 908. In determining whether a grievance is subject to compulsory arbitration: "a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration, unless the parties clearly and unmistakably provide otherwise." *Id.* at 904; *Warrior Gulf*, 363 U.S. at 585; *AT&T*, 475 U.S. at 650. The Union makes no showing that in any CBA Kroger ever committed to allow former employees unconstrained access its property. Obligating Kroger to arbitrate Herdt's grievance now, over three years after leavings its employ and his old bargaining unit, would be improper.

*Teamsters I* did not hold that all former Kroger employees could avail themselves of unlimited grievance rights under the KMA. *See Int'l Ass'n of Machinists & Aerospace Workers v. ISP Chems., Inc.*, F. App'x 841, 846 (6th Cir. 2008). *Teamsters I* held only that the KMA could be the basis for grieving a subcontracting issue, not all issues by all former bargaining unit members.

The case at bar addresses a termination grievance. The LOU specifically provided that Kroger would address only a limited number of named grievances under the KMA: "Kroger agrees to pay the Holiday Pay Class Action Grievance, Robert Minks Grievance, and the Class Action Transportation Dispute Grievance." (DN 58). Unlike the effect of the LOU in *Teamsters I*, which supported the presumption of arbitrability because it addressed subcontracting, here the LOU does not address subsequent termination-related grievances. *Id*. at 908-09. In this case the LOU (1) shows that Kroger agreed to arbitrate only a select few pending grievances under the

- 13 -

KMA, and (2) demonstrates Kroger's intent to exclude subsequent grievances from arbitration under the KMA because Kroger specifically rejected the Union's 2007 proposal that Kroger agree to arbitrate former employee grievances under the KMA. *Teamsters I* found that Kroger's rejection of the Union's proposals was sufficient evidence of Kroger's purpose to exclude future subcontracting grievances. *Id.* However, we reason that Kroger's agreement in the LOU to arbitrate only a select few pending grievances, combined with that fact that Kroger specifically refused to cover former employees' under the KMA is evidence that Kroger intended to avoid the situation at issue here.[7] *Compare Id.* at 909-910; *see AT&T*, 475 U.S. at 649-52.

In *Teamsters I,* the Sixth Circuit was concerned with whether or not the Union could arbitrate its bargained-for right to prevent subcontracting under the KMA, despite the fact that Kroger no longer employed any bargaining unit members (DN 57). In other words, in *Teamsters I* the Union bargained for KDC employees' rights to grieve subcontracting. Here, the Union's bargained-for rights are not at stake—there is no showing of a similar covenant that committed Kroger to allow former employees to access to Kroger's property, or to remain Kroger employees, or to be covered by the KMA when they were no longer employed by Kroger.

Thus, we will not require Kroger to arbitrate Herdt's grievance under the KMA because *Teamsters I* is inapplicable to the circumstances in this case.

---

[7] We need not address whether Kroger offers "the most forceful evidence of a purpose to exclude" termination grievances from former employees because such analysis is required only if "the arbitration clause is susceptible to an interpretation that covers the asserted dispute." *AT&T*, 475 U.S. at 650. Unlike *Teamsters I*, where the LOU addressed arbitrating subcontracting-related grievances, the LOU does not mandate arbitration for termination-related grievances; instead, it permits Kroger to settle only a select few pending grievances under the KMA.

## II

### Whether Kroger is a Joint Employer With Transervice

When two companies are joint employers, a non-signatory to a CBA may be bound by the terms of the signatory company's agreement. *Metro. Detroit Bricklayers Dist. Counsel v. J.E. Hoetger & Co.*, 672 F.2d 580, 581-82 (6th Cir. 1982). Whether a company possesses sufficient control over the work of another company's employees to qualify as a joint employer is "essentially a factual issue." *Int'l Longshoremen's Ass'n v. Norfolk S. Corp.*, 927 F.2d 900, 902 (6th Cir. 1991) (*citing Boire v. Greyhound Corp.*, 376 U.S. 473 (1964)). The Sixth Circuit analyzes four factors in determining whether two companies are joint employers: (1) the interrelation of operations between the companies; (2) common management; (3) centralized control of labor relations; and (4) common ownership. *Norfolk*, 927 F.2d at 902; *Hoetger*, 672 F.2d at 584. Whether a joint employment relationship exists is largely an issue of control:

> [w]here two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute "joint employers" within the meaning of the NLRA.

*3750 Orange Place L.P. v. N.L.R.B.*, 333 F.3d 646, 660 (6th Cir. 2003) (*quoting Carrier Corp. v. N.L.R.B.*, 768 F.2d 778, 781 (6th Cir. 1985)). In assessing whether such control exists, the Sixth Circuit has also considered other factors that evidence control, including the ability: (1) to hire, fire, and discipline; (2) to affect compensation and benefits; and (3) to direct and supervise performance. *Sanford v. Main Street Baptist Church Manor, Inc.*, 448 F. App'x 488, 492 (6th Cir. 2011).

In *Norfolk*, the Sixth Circuit held that no joint employment relationship existed where a company owned the facility in which another company operated, payed the facility's operating

- 15 -

costs, conducted time studies, recommended staff reductions, paid management fees, and had

input on the other company's schedules, holiday pay, and overtime pay. 927 F.2d at 902. The

court held that the facts did not indicate that the companies' operations were "substantially

interrelated beyond the extent necessary to the performance of their basic contractual duties." *Id.*

The court further held that the management agreement between the companies did not evidence

common management or ownership because it "was the product of arm's-length dealings," and

there was little evidence that the companies integrated their operations, or that one controlled the

"day-to-day operations" of the other. *Id.*

Here, applying the Sixth Circuit's four-factor test, the undisputed facts indicate that

Kroger and Transervice have neither common management nor common ownership. *See Norfolk*,

927 F.2d at 902. Transervice alone supervises its KDC employees, cuts their paychecks,

implements employee policies and procedures, determines its own staffing needs, and makes

employee hiring, firing, and disciplinary decisions. The Union's contention that Kroger

recommended to Transervice how many drivers to employ does not evidence joint employment

"beyond the extent necessary to performance of their basic contract," such a recommendation is

"consistent with the conduct to be expected of a party interested in holding down costs." *Id.*

The Union contends that the two remaining factors evidencing joint employment—the

interrelation of operations between the companies and centralized control of labor relations—are

satisfied because Transervice is "simply part of Kroger's KDC management" and because

Kroger retains control of Transervice employees (DN 60).[8] The Union contends that Kroger

---

[8] The court is not persuaded by the Union's allegation that several Transervice managers—who were former Kroger supervisors—evidence interrelated operations because these employees have retained their access to Kroger's computer and email IDs (DN 60). The Union does not provide evidence that these former Kroger supervisors still have

(continued...)

- 16 -

controls Transervice's operations at the KDC because Kroger (1) owns the KDC warehouse, trucks, forklifts, and carts used by Transervice employees; (2) pays the KDC's operation costs, such as the electricity bill; (3) centralizes Transervice employees' dispatching, tracking, and work assignments for all Kroger warehouses through its computer system; (4) requires weekly invoices and delivery reports from Transervice; (5) has conference calls several times a week with Transervice management to discuss service issues; (6) sets a two hour delivery window for each delivery; (7) selected the lumping company that operates at the KDC; and (8) had some involvement negotiating the Union's CBA with Transervice (DNs 57 and 60).[9]

Under the four-factor analysis, Kroger's mere involvement in Transervice's day-to-day operations is not enough to show "interrelation of operations" without additional evidence that Kroger had control over the terms and conditions of employment, such as hiring, firing, discipline, or negotiating authority. *John Breuner Co.*, 248 NLRB 983, 989 (1980) (noting that cases finding joint employment of delivery drivers are supported by findings that the distributor or its supervisors directly supervised and controlled the trucking contractor's employees—which requires more than showing the interrelation of operations was "only to the degree necessary to coordinate [subcontractors] functions."); *See Local 773 Int'l Brotherhood of Teamsters v. Cotter & Co.*, 691 F. Supp. 875 (E.D. Pa. 1998) (holding that a contractor who supervised and dictated

---

[8](...continued)
Kroger managerial responsibilities, that the supervisors in fact access Kroger's system, or that such access demonstrates interrelation of operations.

[9] The court will not consider the Union's allegations that are unsupported by the facts. Specifically, the Union's allegation (1) that transportation work by Transervice at the KDC is performed "at the sole discretion of Kroger;" (2) that day-to-day assignment of transportation work at the KDC is jointly assigned and dispatched by Kroger and Transervice; and (3) that through the contract with Transervice, Kroger maintains "final control over wages, benefits, terms and conditions of employment of Transervice's employees at the KDC." (DN 1).

the number of daily runs for a subcontractor's trucking company, and specifically instructed drivers on protocol—such as how to lock gates and jockey trucks—was insufficient to show interrelation of operations for joint employment because the contractor did not control the terms and conditions of employment).

Also, the facts do not show that Kroger exercised a sufficient "degree of control over labor relations" with Transervice to establish a joint employee relationship. *See Hoetger*, 672 F.2d at 584-85. The Union contends that Kroger injected itself into Transervice's labor negotiations in 2007 because Kroger refused to allow Transervice to agree that KDC employees could participate in the pension fund post-changeover, and because Kroger hired strike replacements during the KDC employees' 2007 strike in order for Transervice to maintain operations at the KDC (DN 60). Kroger's short-term involvement does not indicate that Kroger "integrally insert[ed] itself into the material terms of the employment obligations." *Hoetger*, 672 F.2d at 585; *See Cotter*, 691 F. Supp. at 882-83 (holding that a company's involvement in a subcontractor's CBA with the Union did not make the company a "participant" in collective bargaining negotiations sufficient to evidence a joint employer relationship when the company requested that the subcontractor "check with" the company during negotiations and complained to the subcontractor about high labor costs).

Further, regarding to control over labor relations, in *Hoetger* the Sixth Circuit held that the only element which would support finding joint employment is control over labor relations when two companies have a contractual relationship and there is no showing of integrated operations, common management or control. *Id.* In this situation, the degree of control of labor relations will not support joint employment without showing that a company was (1) exercising

day-to-day control over the other company's employees; (2) making "any actual hiring or firing decisions;" and (3) supervising the other company's employees. *Id*.

The Union does not show that Kroger controlled Transervice's day-to-day operations, nor does it show that Kroger made hiring and firing decisions. Transervice terminated Herdt and the court is not persuaded by the Union's contention that Kroger's act of banning Herdt from its facility was constructive termination. The Union cites no authority for its contention that Kroger's refusal to lift the ban against Herdt takes "control over labor relations" away from Transervice or demonstrates that Kroger fired or disciplined Transervice's employees beyond the extent of their contractual relationship. *See Hoetger*, 672 F.2d at 584. Transervice is required to being Herdt back with backpay and benefits, not Kroger.

We find the Second Circuit's explanation of the four-factor analysis instructive: in *Clinton's Ditch*, 778 F.2d at 138, the Second Circuit found the fact that a company complains to a contractor about problems that the company's customers had with the contractor's drivers, and that the company "expected appropriate action to be taken" against the contractor's drivers did not demonstrate joint employment. The court explained that, "any business has a legitimate interest in determining if its subcontractor's employees have offended its customers or have otherwise provided unsatisfactory service . . . An employer need not mutely suffer incompetence or misbehavior by its subcontractor's employees in order to avoid status as a joint employer." *Id*.

Here, as Transervice's customer, Kroger did not discipline Transervice's employees, Kroger merely notified Transervice when a Transervice driver made a bad delivery, had a disagreement with a store employee, or in this case, allegedly stole from Kroger. *See id.*; *see Litton Fin.*, 501 U.S. 190. The facts show that Kroger acted to oversee its contractors

performance to ensure consistency among its warehouses, and to see that its products meet its

standards—which further supports Kroger's identity as Transervice's customer, not a joint

employer. *See Clinton's Ditch*, 778 F.2d at 138.

The Contract Carrier Services Agreement between the companies specifically provides

that Kroger is not a joint employer with Transervice (DN 60):

> SHIPPER-CARRIER RELATIONSHIP: It is understood that this is not an
> agreement of a partnership or employment of Carrier [Transervice] or of any of
> Carrier's employees by Shipper [Kroger] and that Carrier and Shipper are
> independent contractors. It is further understood that the Carrier is not the exclusive
> transportation provider for the Shipper. The Carrier understands that it's [sic] ability
> to provide superior transportation services at competitive costs, is the material
> inducement for the Shipper to enter this relationship.

While contract language is not controlling, it is "persuasive evidence of the parties' intentions

and of their understanding of their contractual arrangement." *Norfolk*, 927 F.2d at 902. The

contract confirms Kroger's contention that it is a customer of Transervice and retains no control

over Transervice's employee terms and conditions of employment (DN 57). Transervice does not

show that the companies were "substantially interrelated beyond the extent necessary to the

performance of their basic contractual duties." *See Norfolk*, 927 F.2d at 902.[10]

Kroger's presence at the KDC is limited: Kroger did not employ on-site supervisors at

the KDC; approximately four Kroger employees are at the KDC to inspect inbound produce;

Kroger's Supply Chain Manager ("SCM") visits the KDC approximately twice a month to meet

---

[10] Under the agreement (1) Kroger will supply Transervice equipment, products, and use of the KDC; (2) Transervice will perform transportation services—maintain and insure equipment, receive products per Kroger's shipment schedule, and transport and deliver products; (3) Transervice will maintain Kroger's standards for services and product availability; (4) both parties will "mutually agree[]" on delivery schedules; (5) Transervice will "coordinate," "implement," and "monitor" its own compliance, and submit weekly invoices and monthly performance information; (7) Kroger will pay Transervice on an "actual costs plus fee" basis, and reimburse transportation expenses; (8) Kroger will also pay a weekly "Corporate Administration Fee" and a bonus for on-time deliveries, based on a four hour delivery window with a built-in two-hour cushion before and after the delivery time.

Transervice's upper management; and the SCM participates in conference calls with
Transervice's managers multiple times each week to discuss service issues, complaints, and
planing (DN 57). Thus, Kroger's presence at the KDC conforms with the Carrier Agreement and
Transervice does not show that Kroger controlled the day-to-day operations at the KDC such that
the companies were substantially interrelated beyond the performance of their basic contractual
duties. *See Norfolk*, 927 F.2d at 902.

Summary judgment for Kroger is appropriate. A separate order will be entered in
accordance with this opinion.

February 1, 2013

**Charles R. Simpson III, Senior Judge**
**United States District Court**